Jacqueline **BAYARD** and Joanne Spina, Plaintiffs,

v.

Ronald **RICCITELLI**, Getty Petroleum Corp. and Getty Terminals Corp., Defendants.

No. 89 CV 4298.

United States District Court, E.D. New York.

Jan. 24, 1997.

Philip J. Kaplan, Staten Island, NY, for plaintiffs.

Greenbaum, Rowe, Smith, Ravin, Davis & Himmel (Robert J. Kipnees, of counsel), Iselin, NJ, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiffs Jacqueline Byard (spelled "Bayard" in the caption) and Joanne Spina bring this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiffs say that their supervisor, Ronald Riccitelli, sexually harassed and assaulted them and that their employers, Getty Terminals Corporation (Getty Terminals) and Getty Petroleum Corporation (Getty Petroleum), were responsible for a hostile work environment, and brought discriminatory and retaliatory measures against them.

Plaintiffs also make claims of violation of the New York State Human Rights Law, N.Y.Exec.Law § 290 *et seq.,* and of assault and intentional infliction of emotional distress under New York common law. Plaintiffs ask for injunctive relief and compensatory and punitive damages.

Defendants Getty Terminals and Getty Petroleum (collectively "Getty") move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, or, in the alternative, for partial summary judgment.

### I.

#### A. *The workplace structure*

The following facts are undisputed. Spina and Byard were clerical workers at Getty's Long Island City Terminal. Spina started in September, 1986, Byard in September, 1987. Their duties included using the computer, answering the telephones, typing, filing, taking gasoline orders, and setting up drivers' delivery schedules.

Riccitelli was a terminal supervisor at the terminal. James Masone, at one point lead foreman and later assistant terminal superintendent, was Riccitelli's immediate supervisor. Above Masone was John Bohmke, terminal manager for the Long Island City, Mount Vernon and Oceanside terminals, and above Bohmke was Paul Stendardi, Director of Terminals. Stendardi reported directly to Alvin Smith, a Senior Vice President of Getty Petroleum. Smith's immediate supervisor was the Chief Executive Officer of Getty Petroleum, Leo Liebowitz.

Getty Terminals is a wholly owned subsidiary of Getty Petroleum, and operates the supply, storage and delivery of petroleum products for Getty Petroleum's terminals in the Northeastern United States. Getty Petroleum operates a single Human Resources Department, which handles personnel matters for Getty Petroleum and all of its subsidiaries. During the relevant time period Arthur King was Getty Petroleum's Director of Personnel.

#### B. *Plaintiffs' claims of harassment*

In her deposition, Spina testified that Riccitelli began to harass her verbally in May or June of 1988 and soon, perhaps as early as July, 1988, started physically to harass her. According to Spina, Riccitelli pinched and grabbed her in various parts, exposed his underwear on his way to the bathroom, and at least once grabbed her hand to try to make her touch his penis.

Spina testified that in December of 1988 Riccitelli dragged her into the bathroom, pushed her against the wall, and, banging her head, unbuttoned and tried to unzip her pants. Only when she screamed at Riccitelli, Spina claims, did he let her go. Spina testified that Riccitelli told her "if you open your mouth, I will come after you."

Plaintiffs' amended complaint alleges that Riccitelli began to harass Byard sexually as early as December of 1987. In her deposition, Byard says that Riccitelli grabbed her in various parts, made sexually suggestive comments to her, and lowered his pants in front of her. On February 12, 1989, Byard suffered a stroke at work that partially paralyzed her. Byard testified that while she was thus suffering, Riccitelli helped her to the bathroom, fondled her vagina, and attempted to rape her as he sat her on the toilet.

### C. *Plaintiffs' complaints to Getty management and management's response*

There is little agreement as to how often plaintiffs complained to Getty management about Riccitelli. Although plaintiffs' deposition testimony is contradictory on this point, both of them essentially say they complained to Masone, either jointly or individually, about Riccitelli on several occasions, but that the harassment continued.

Masone remembers only one occasion when plaintiffs made complaints to him. In his deposition, he said that Spina and Byard told him in January, 1989 that Riccitelli had exposed himself and touched their breasts. Masone said that he then spoke with Riccitelli about what Spina and Byard had said and that Riccitelli denied everything.

Riccitelli testified that he does not recall Masone speaking to him about Byard's or Spina's claims until after Byard's stroke on February 12, 1989.

In late February, 1989, about two weeks after Byard's stroke, someone sent an anonymous letter to Liebowitz, Getty Petroleum's Chief Executive Officer, alleging extortion, improper employee timekeeping, and sexual harassment at the terminal. As a result of the letter, Arthur King and Paul Stendardi instructed John Bohmke to conduct an investigation.

On February 28, 1989, Bohmke interviewed Spina, and she told him about Riccitelli's assault of her in December, 1988. Bohmke asked her to prepare a written report about the incident.

She did so on March 3, 1989, addressing the report "To whom it may concern". She described how she had been sexually harassed repeatedly by Riccitelli, and how she and Byard had complained to Masone, who did not respond, finding their claims difficult to believe. The report said that only after Spina told Masone that Riccitelli had attempted to rape her did he finally take action. The report also stated that other Getty employees, including Jim Geraci and Jorge Figueroa, like Riccitelli terminal supervisors, witnessed his acts of harassment.

Byard returned to work in late March or early April of 1989, almost two months after her stroke, and met with Bohmke to discuss the anonymous letter and what had happened the day of her stroke.

On April 11, 1989, Riccitelli's shift was permanently changed so that he would never work at the same time as Byard or Spina. Getty claims this was the day after Byard had met with Bohmke; Byard testified that she thought it was a few weeks after the meeting.

King, Getty Petroleum's director of personnel, interviewed Spina on May 1, 1989. Six weeks later, on June 20, 1989, he prepared a memorandum for the file which summarized what Spina had said. The summary was for the most part consistent with Spina's written report.

On May 23, 1989, both Spina and Byard filed sexual harassment complaints with the New York State Human Rights Division. Their complaints were thereafter sent to the Equal Employment Opportunity Commission.

On May 31, 1989, Spina was fired for allegedly spreading false rumors that Geraci and Masone were smoking marihuana on the job. Spina admits in her deposition that she had little basis for saying this. Three days later she was notified that her discharge had been converted to a temporary suspension and that she could immediately resume her position at Getty Terminals. Spina refused to return to work, saying that even though Riccitelli's shift had been changed, she did not wish to work at the same location as he did. Getty then offered her a comparable position at a different location. She refused.

For reasons that are unclear, Riccitelli was terminated on June 15, 1989. Byard continued to work at Getty until she was terminated on August 31, 1990.

Plaintiffs commenced this action on December 22, 1989. At the request of plaintiffs' counsel, the case was placed on the inactive list shortly after its initial filing. The case remained inactive until February, 1994.

## II

In its motion for summary judgment, Getty argues that: (1) Getty Petroleum was not plaintiffs' "employer" under either Title VII or New York's Human Rights Law; (2) plaintiffs had a reasonable avenue of complaint and Getty took action to stop the alleged harassment; and (3) plaintiffs cannot demonstrate that Getty retaliated against them. Alternatively, Getty asks for partial summary judgment limiting Byard's backpay damages.

Getty also asks for summary judgment (a) dismissing plaintiffs' mental anguish claims under New York's Human Rights Law because it says plaintiffs cannot provide evidence of the duration or severity of their mental injuries and (b) dismissing the state law claims for assault and intentional infliction of emotional distress.

## III

Under Federal Rule of Civil Procedure 56(c) the court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movants are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On the motion the court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movants. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## IV

Title VII states in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...

42 U.S.C. § 2000e–2(a)(1). New York's Human Rights Law makes it unlawful:

For an employer ... because of the ... sex ... of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y.Exec.Law § 296(1)(a). Because New York's Human Rights Law and Title VII entail comparable standards of proof, *see Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1048 (2d Cir.1992), the court treats plaintiffs' claims under the two laws simultaneously.

To determine whether a parent company such as Getty Petroleum is an "employer" under Title VII the court considers a variety of factors, the most important of which is the "degree of control [the parent company] exercises over policy making and the means and manner of an employee's work performance." *Dortz v. City of New York*, 904 F.Supp. 127, 145 (S.D.N.Y.1995) (quoting *Alie v. NYNEX Corp.*, 158 F.R.D. 239, 246 (E.D.N.Y.1994)). The court also considers whether there is an integrated economic relationship between the parent and subsidiary, but this is not controlling. *Id.*

Under New York's Human Rights Law the court focuses on whether: (1) the company had the power to select the employee, (2) the company paid the employee's salary or wages, (3) the company had the power to dismiss the employee, and (4) the company had the power to control the employee's conduct. *Goyette v. DCA Advertising, Inc.*, 830 F.Supp. 737, 746 (S.D.N.Y.1993) (citations omitted). The last factor is the most important. *Id.*

The record suggests that Getty Petroleum exercised a significant degree of control over employee conduct. Getty Petroleum had one personnel department that handled personnel matters for all its subsidiaries. On its letterhead it issued employee policy statements signed by its Chief Executive Officer and governing terminal employees. Although plaintiffs said they were employed and paid by Getty Terminals, letters concerning their employee benefits were issued on Getty Petroleum letterhead.

There is also evidence that the management structure of the parent and subsidiary were intertwined. Masone, plaintiffs' as well as Riccitelli's supervisor, testified that Getty Petroleum employed him. Bohmke, Masone's supervisor, testified that Getty Petroleum "employed" him but he "worked" for Getty Terminals. Bohmke's superiors were corporate officers of Getty Petroleum.

Getty Petroleum, through its agents, had control over the hiring and firing of employees. Masone, a Getty Petroleum employee, hired Byard and had the power to recommend discipline or termination for poor job performance. Bohmke, apparently a Getty Petroleum employee, performed Byard's annual merit review, had the power to suspend Spina and Byard without pay, and signed the memorandum terminating Spina.

The factfinder could reasonably conclude that Getty Petroleum constituted plaintiffs' employer under Title VII and New York's Human Rights Law.

### V.

■ To succeed in a claim for discriminatory harassment based upon a hostile work environment, plaintiffs must show: (1) that their workplace was permeated by such a severe discriminatory intimidation as to alter the conditions of their work environment, *see Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citations omitted), and (2) that there is a specific basis for imputing to the employer the conduct that created that hostile environment. *See Murray v. New York University College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995) (citing *Karibian v. Columbia Univ.*, 14 F.3d 773, 779 (2d Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994), *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 62 (2d Cir. 1992)). *See also Espaillat v. Breli Originals, Inc.*, — A.D.2d ——, 642 N.Y.S.2d 875 (1st Dep't 1996).

■ In accordance with traditional rules of agency, *see Meritor Savings Bank, FSB, v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), an employer will be liable for an abusive work environment created by plaintiffs' supervisor if he "uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship." *Karibian*, 14 F.3d at 780.

■ When the supervisor does not rely upon his authority to harass, or when the harasser is a co-employee, the employer is liable only if plaintiff can prove that the employer provided no reasonable avenue of complaint, or knew, or should have known, of the harassment but did not take appropriate action. *See Murray*, 57 F.3d at 249; *Kotcher*, 957 F.2d at 63 (citations omitted).

### A. *The existence of a hostile work environment*

Getty argues that Riccitelli's acts were sporadic and isolated and not "sufficiently severe or pervasive" to establish a claim for hostile work environment.

■ By its nature the determination of whether a work environment is "hostile" or "abusive" depends on a variety of circumstances, including the severity and frequency of the harassment, its manifestation in physically threatening or humiliating action, *see Harris*, 510 U.S. at 23, 114 S.Ct. at 371, the degree to which it is continuous and concerted, *see Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir.1989), and its offensiveness. *Id.* at 578. Patently the determination of whether a hostile workplace exists is not often susceptible to summary resolution. *See DiLaurenzio v. Atlantic Paratrans, Inc.*, 926 F.Supp. 310, 314 (E.D.N.Y.1996).

■ There is a genuine issue of fact as to how pervasive Riccitelli's harassment of plaintiffs was. Although plaintiffs could not specify the exact number of harassing incidents, both testified that Riccitelli subjected them to highly offensive treatment over a three or four month period. Moreover, both say they were physically assaulted by Riccitelli at the worksite, acts sufficiently severe for the factfinder to find from that alone the existence of a hostile work environment.

The fact that some of plaintiffs' co-workers testified that they had never seen Riccitelli

behave as plaintiffs allege may create an issue of fact but that is hardly a basis for summary judgment.

### B. *Riccitelli's supervisory authority*

Getty claims that Riccitelli was a low-level shift supervisor with limited authority over the clerical workers, and that there is no evidence in the record that Riccitelli invoked what authority he had to facilitate the harassment.

Riccitelli admittedly had some supervisory authority over plaintiffs Byard and Spina, but the extent of his supervisory duties is unclear. Bohmke and Masone appear to have been the principal supervisors of Byard and Spina. It was Bohmke who signed Byard's annual merit review, as well as the letter suspending her in 1990. Masone testified that he recommended disciplining Spina for spreading false rumors, and that he reprimanded Byard for poor job performance.

Although Riccitelli may have been a shift supervisor, he did not have the power to control the terms or conditions of Byard's and Spina's employment. It does not appear Riccitelli used what authority he did have to carry out or facilitate his harassment. But Getty would be liable if it failed to provide plaintiffs with a reasonable avenue of complaint, or if it knew, or should have known, of the harassment but did not take appropriate action.

### C. *Whether Getty provided a reasonable avenue of complaint*

Getty says that both Spina and Byard admitted that they had an avenue of complaint through the Getty managerial hierarchy, and that they failed to pursue this avenue.

Plaintiffs' deposition testimony shows that plaintiffs understood Getty's managerial structure. Spina testified that she understood if she wasn't satisfied with Masone, she could complain to Bohmke, and Byard testified that she understood that Bohmke was the terminal "boss" and that Stendardi was Bohmke's supervisor.

■ Neither statement provides a basis for summary judgment for Getty. Whether an employer has provided a reasonable ave-

nue of complaint requires more than an employee's understanding of the company's management structure. Equal Employment Opportunity Commission guidelines require employers to "take all steps necessary to prevent sexual harassment." 29 C.F.R. § 1604.11(f). In *Meritor,* the Supreme Court rejected the view that "the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure [can] insulate petitioner from liability." 477 U.S. at 72, 106 S.Ct. at 2408.

■ From the facts of record, the factfinder could conclude that Getty failed to provide a reasonable avenue of complaint. Getty's employee policies in the record did not establish grievance procedures for employees dissatisfied with their working conditions, let alone a procedure for those who feel they have been sexually harassed by a co-employee or supervisor. Although the absence of a sexual harassment policy is not by itself enough to hold Getty liable, *see Reed v. A.W. Lawrence,* 95 F.3d 1170, 1180 (2d Cir.1996), the lack of any formalized grievance procedure is sufficient to preclude summary judgment.

The factfinder could also conclude that Getty failed to provide a reasonable avenue of complaint based on the fact that it took an anonymous letter to Getty Petroleum's Chief Executive Officer to prompt a formal investigation to the allegations.

### D. *Whether Getty knew of the harassment and failed to take adequate action*

Getty says that, as plaintiffs admitted, the harassment ceased after they spoke with Masone and that Getty management has shown a prompt response to the complaints.

■ When an employer takes action only after repeated complaints suggesting a hostile work environment, or when there are doubts concerning the adequacy or effectiveness of the measures taken, summary judgment in a Title VII case is inappropriate. *See Walsh v. National Westminster Bancorp. Inc.,* 921 F.Supp. 168, 173 (S.D.N.Y. 1995) (citations omitted). Such doubts are raised when, for example, the employer only transfers the complaining party, or merely

reprimands an offender for particularly grievous conduct. *Id.*

There is an issue of fact as to the adequacy and promptness of Getty's response to plaintiffs' complaints. It is true that both Spina and Byard admit that Riccitelli's harassment eventually stopped. But they also testified that their initial complaints to Masone were ineffective. Spina said that despite her complaint to Masone in the fall of 1988, Riccitelli's harassment continued. Similarly, Byard said that even after she met with Masone, Riccitelli continued to expose his underwear to her. Both plaintiffs testified that not only had they complained to Masone, but that, contrary to Masone's assertions, he had actually seen some of the acts of harassment.

Even accepting Masone's account, the factfinder could conclude that Getty's response was inadequate. He admitted that after Spina and Byard complained to him, he spoke with Riccitelli but did not investigate the matter further. Riccitelli's assault on Byard occurred at least one month after plaintiffs had complained to him.

Getty, relying on *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708 (2d Cir.1996), argues that Masone's knowledge of the harassment cannot be imputed to Getty, because he is not "at a sufficiently high level in the [company] hierarchy." *Id.* at 715 (quoting *Kotcher,* 957 F.2d at 64). In essence Getty says that it did not know, nor could have known, of the harassment until February 28, 1989 when the company's Chief Executive Officer received the anonymous letter. At that point, Getty claims, it promptly and effectively responded to the allegations.

Masone, as terminal superintendent with power to recommend employee discipline and termination, occupied a sufficiently high level as to make it reasonable to impute his knowledge to Getty.

In any event *Van Zant* is not controlling here. There, the employer, KLM Airlines (KLM), conducted an investigation within thirty-six hours of the plaintiff's report to her immediate supervisor of the harassment. Ten days later the alleged harasser was terminated. The Second Circuit said that KLM had taken prompt and effective action and

refused to impute to KLM the prior knowledge of a low-level supervisor in another department of the harasser's proclivity for inappropriate behavior. *Van Zant,* 80 F.3d at 715.

Here plaintiffs claim they reported the harassment to their and Riccitelli's immediate supervisor who failed to take action. Where notice is given to plaintiffs' and the alleged harasser's supervisor, it is reasonable to conclude that the employer has notice of the allegations.

Finally, even if it were determined that Getty had notice of the harassment only when Bohmke began his investigation and personally interviewed the plaintiffs, it still took almost two months for Riccitelli's shift to be changed. The factfinder could reasonably conclude that such delay was unreasonable.

There is a genuine issue of fact as to whether Getty provided plaintiffs a reasonable avenue of complaint and whether Getty knew of the harassment but took no adequate measures. Summary judgment is inappropriate.

## VI.

Getty says that plaintiffs have failed to assert a prima facie claim for unlawful retaliation.

In order to maintain such a claim under Title VII, plaintiffs must show that they participated in a protected activity—e.g. complained about the harassment, Getty knew of this activity and took an employment action disadvantaging the plaintiffs, and there is a causal connection between the protected activity and Getty's action. *See Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (citations omitted). A short time between an employee's complaint and the discriminatory treatment may justify an inference of a causal connection. *Id.* (quoting *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)).

The defendant then has the burden to articulate a legitimate, non-discriminatory reason for its action. *See Johnson,* 931 F.2d

at 207 (quoting *Taitt v. Chemical Bank,* 849 F.2d 775, 777 (2d Cir.1988)). Plaintiffs must then show that the reasons advanced were pretextual. *Id.* (citations omitted).

Plaintiffs allege that as a result of their complaints about Riccitelli, they were denied overtime, prohibited from making personal phone calls, and told not to talk to drivers. Both plaintiffs also claim that they were discharged on account of their complaints.

As to both plaintiffs, there is an issue of fact as to whether they were denied overtime as a result of their complaints. Spina testified that the day after she spoke with Bohmke about the anonymous letter and her allegations of sexual harassment, Masone told her that there would be "no more overtime for you and Jacqueline." Spina concedes that her previous requests for overtime had not always been granted, but states that she did receive overtime the majority of times she asked. Masone's statement, if credited by the factfinder, indicates that she and Byard were singled out for differential treatment and the factfinder could conclude that such treatment was on account of their complaints.

■ Plaintiffs' retaliatory discharge claims must be treated individually. Getty terminated Byard a year after her complaints about Riccitelli and management's investigations. More than three months prior to her discharge, Bohmke wrote Byard a letter detailing her deteriorating job performance, suspending her without pay for two and one-half days and warning her that if her performance did not improve, she would be terminated.

Bohmke's letter to Byard listed several examples of her poor conduct including: customer complaints about her telephone manner, taking an entire day to complete tasks that should take less than an hour, spending excessive amounts of time in the bathroom, using the toll-free line for unauthorized personal calls, and posting delivery cards for incorrect accounts.

Too long a period of time passed between Byard's complaints to management and her ultimate discharge to justify an inference that there was a causal connection between those complaints and her termination. No other evidence exists in the record to warrant such a connection and plaintiffs' have presented no evidence to suggest that Byard's poor job performance report was pretextual. The court grants Getty summary judgment as to Byard's retaliatory discharge claim.

Because Byard has failed to state a claim for retaliatory discharge, the court need not address Getty's argument that her damages should be limited by the subsequent discovery of her wrongdoing.

In plaintiffs' opposition papers, Spina claims for the first time that she was constructively discharged because once her discharge was converted to a temporary suspension and she was offered reinstatement, she refused to return to work.

■ When an employer, rather than acting directly, "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation[,]" constructive discharge has occurred. *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (quoting *Young v. Southwestern Savings and Loan Ass'n.,* 509 F.2d 140, 144 (5th Cir.1975)). To maintain such an action, a plaintiff must prove that the working conditions were so unpleasant that a "reasonable person in the employee's shoes would have felt compelled to resign." *Id.* (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir. 1977)).

■ Spina's discharge and suspension occurred within the month that she and Byard filed complaints with New York State's Human Rights Division. Given the nature of Riccitelli's alleged harassment of Spina and Getty's purported delay in responding to her complaints, the factfinder could find that a reasonable person in Spina's position would have deemed work for Getty as intolerable.

■ Although there is little evidence that Getty's actions in this respect were deliberate, the Second Circuit disfavors summary judgment when defendants' state of mind is at issue. *See Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991). Resolving all ambigu-

ities in favor of the non-movant, the court concludes that Getty is not entitled to summary judgment as to Spina's retaliatory discharge claim.

Getty says that even if Spina succeeds in proving that she was constructively discharged, she forfeited her right to backpay when she refused to return to her prior position or to the comparable position she was subsequently offered.

 It is true that absent "special circumstances," a plaintiff "forfeits her right to backpay if she refuses a job substantially equivalent to the one [she] was denied[.]" *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982). But in a constructive discharge case plaintiff's refusal of a reinstatement offer will not limit an employer's backpay liability when the employer's offer is unaccompanied by credible assurances that the harassment will cease, *see Miano v. AC & R Advertising, Inc.*, 875 F.Supp. 204, 226 (S.D.N.Y.1995), or when the level of harassment and hostility in the workplace makes an employment relationship impossible to reestablish. *See Maturo v. National Graphics, Inc.*, 722 F.Supp. 916, 927 (D.Conn.1989).

 There is insufficient evidence in the record for the court to resolve the question of whether Spina justifiably refused Getty's reinstatement offer. Summary judgment as to Spina's potential backpay award is at this time inappropriate.

### VII.

Magistrate Judge Chrein has barred plaintiffs from using a medical expert at trial to testify about plaintiffs' mental injuries. Getty argues that because plaintiffs now cannot provide evidence of the duration and severity of their mental injuries, plaintiffs' claims for mental anguish under New York's Human Rights Law should be dismissed.

 New York's Human Rights Law affords victims of discrimination compensatory damages for mental anguish and proof of mental anguish damages can be based on the plaintiffs' testimony alone. *See Cullen v. Nassau County Civil Service Comm'n*, 53 N.Y.2d 492, 497, 442 N.Y.S.2d 470, 473, 425

N.E.2d 858, 860–61 (1981). So that such awards are exclusively compensatory and do not become a proxy for punitive damages, courts require that the complainant's testimony be corroborated by "reference to the circumstances of the alleged misconduct." *New York City Transit Auth. v. State Div. of Hum. Rights*, 78 N.Y.2d 207, 216, 573 N.Y.S.2d 49, 54, 577 N.E.2d 40, 45 (1991).

 There is sufficient evidence in the record to withstand a summary judgment motion. Spina testified at her deposition that following Riccitelli's assault of her she had trouble sleeping, didn't eat very much and lost about ten pounds. She testified that her experiences at Getty humiliated and embarrassed her.

Although Byard's deposition testimony does not specify the scope of her mental injuries, neither is there anything to indicate that she suffered no mental anguish.

### VIII.

Getty says that they should not be held liable for Riccitelli's intentional torts and that plaintiffs' common law claims against it should be dismissed.

 Under New York law, an employer is liable for the torts an employee commits while acting in the course of his or her employment. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995) (citations omitted). "Torts committed for personal motives unrelated to the furtherance of the employer's business" cannot be imputed to the employer. *Island Associated Coop., Inc. v. Hartmann*, 118 A.D.2d 830, 831, 500 N.Y.S.2d 315, 316 (2d Dep't 1986).

 Here nothing suggests that Riccitelli's actions were carried out in furtherance of Getty's business. Plaintiffs' state law claims for assault and intentional infliction of emotional distress against Getty are dismissed.

### IX.

 Because this action arose prior to the enactment of the 1991 Civil Rights Act, plaintiffs, under Title VII, are entitled only to equitable relief and awards of backpay.

See *O'Brien v. King World Productions, Inc.*, 669 F.Supp. 639, 641 (S.D.N.Y.1987).

Should plaintiffs be successful at trial, they would be entitled to backpay for whatever overtime they were denied because of their complaints concerning the harassment. Spina could also recover for any backpay she is owed due to her constructive discharge. Although hostile environment claims do not provide an independent basis for damages under pre–1991 Title VII law, plaintiffs can recover compensatory damages for mental anguish under New York's Human Rights Law. *See Cullen*, 53 N.Y.2d at 496, 442 N.Y.S.2d at 472, 425 N.E.2d at 859–60. Neither pre–1991 Title VII law nor New York's Human Rights Law authorizes punitive damages. *See O'Brien*, 669 F.Supp. at 641; *Thoreson v. Penthouse International, Ltd.*, 80 N.Y.2d 490, 499, 591 N.Y.S.2d 978, 981–82, 606 N.E.2d 1369, 1372–73 (1992).

## X.

Getty's motion for summary judgment is granted as to Byard's retaliatory discharge claim. Plaintiffs' common law tort claims are dismissed as to Getty Terminals Corporation and Getty Petroleum Corporation. In all other respects, the motion is denied.

So ordered.